John A. Blyth
HACH & ROSE, LLP
112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: (212) 779-0057
Facsimile: (212) 779-0028

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JULIUS SIMAS, JR.,<br><br>Plaintiff,<br><br>v.<br><br>FRATELLI BERETTA USA, INC. and COSTCO WHOLESALE CORPORATION,<br><br>Defendants. | **Civil Action No.: 23-cv-3384**<br><br><br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Julius Simas, Jr., by and through his attorneys, Hach & Rose, LLP complaining of the Defendants, Fratelli Beretta USA, Inc. and Costco Wholesale Corporation, collectively ("Defendants"), respectfully alleges as follows:

### PARTIES

1.      Plaintiff Julius Simas, Jr. ("Plaintiff" or "Mr. Simas") was and still is a resident of the Commonwealth of Massachusetts, Middlesex County.

2.      Defendant Fratelli Beretta USA, Inc. ("Fratelli") is incorporated in the State of New Jersey with its headquarters and principal place of business located in New Jersey at 750 Clark Drive, Mount Olive, NJ 07828, Morris County. Fratelli processes, packages and sells Italian cured meats and other Italian cuisines.

3.     Defendant Costco Wholesale Corporation ("Costco") is incorporated in the State of Washington with its headquarters and principal place of business located in Washington State at 999 Lake Drive Issaquah, WA 98027.  Costco is a membership warehouse club that sells name-brand food and merchandise to customers at its hundreds of warehouse locations worldwide, including its warehouse located at 200 Legacy Blvd, Dedham, MA 02026.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs, and because there is complete diversity of citizenship among the parties.

5.     Venue properly lies in the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in that district. Venue is also properly laid in this Court pursuant to 28 U.S.C. § 1391 (b)(3) in that Defendant Fratelli operates, does business, and maintains its principal place of business within the district in which the Court is located, and is subject to this Court's personal jurisdiction. This includes the processing, manufacture, and packaging of the contaminated food at its Mount Olive, NJ facility located within this district that caused Plaintiff's injuries giving rise to this action.

## FACTS

### Fratelli Beretta Contaminated Uncured Antipasto Trays

6.     Defendant Fratelli processes, packages, and distributes processed Italian meat trays which are sold at various retailers throughout the country, including at Costco stores.

7.     This includes the product known as "Fratelli Beretta Uncured Antipasto prosciutto, soppressata, Milano salami, & coppa" sold as 24-oz trays containing two 12-oz packages with "best by" dates on or before February 11, 2022 (the "Antipasto Trays").

8.     The Antipasto Trays bore establishment number "EST. 7543B" printed on the packaging next to the best by date and were assigned UPC code 073541305316.

9.     The ready-to-eat (RTE) Antipasto Trays were produced by Fratelli on February 28, 2021 through August 15, 2021. Fratelli shipped the Antipasto Trays to retail locations nationwide, including Costco warehouses.

10.     Fratelli's Antipasto Trays with best by dates on or before February 11, 2022 (with UPC code 073541305316) were processed, sliced, manufactured, packaged, stored, and distributed from Fratelli's food processing facility located in Mount Olive, NJ.

11.     Costco was one of the retailers who accepted delivery of the contaminated Antipasto Trays for the purposes of selling the Antipasto Trays in their warehouses, including its warehouse located at 200 Legacy Blvd, Dedham, MA 02026 (the "Dedham Costco").

12.     Unbeknownst to Costco's members, including Plaintiff, the subject Antipasto Trays were contaminated with *Salmonella* Infantis and/or *Salmonella* Typhimurium.

### *Plaintiff's Consumption of the Product and his Subsequent Illness*

13.     At all relevant times to this action, Costo offered the contaminated Fratelli Antipasto Trays for sale to its customers at the Dedham Costco.

14.     On June 30, 2021, Plaintiff's wife, Karin Simas ("Mrs. Simas"), was a Costco Member with Member # 000111869172141.

15.     On June 30, 2021, Mrs. Simas purchased the Fratelli Antipasto Tray from the Dedham Costco. The purchase receipt for the transaction of June 30, 2021 included "Item 1191091, Beretta Uncured Antipasto, $13.69."

16.     Following his wife's purchase of the subject Antipasto Tray, in July 2021, Mr. Simas consumed the product.

3

17.     On or about July 25, 2021, Mr. Simas was hospitalized with extreme abdominal pain, fevers to 103, and uncontrollable diarrhea. Mr. Simas was admitted from July 25, 2021 through August 1, 2021. His symptoms began following his consumption of meat from the Fratelli Antipasto Tray.

18.     It was later determined that Mr. Simas was suffering from salmonella enterocolitis.

***The Recall***

19.     On August 24, 2021, the United States Department of Agriculture's Food Safety and Inspection Service ("FSIS") posted on its website details of an ongoing investigation into a Salmonella outbreak linked to Italian-style meats. The public health alert advised as follows:

> CDC, public health and regulatory officials in several states, and the U.S. Department of Agriculture's Food Safety and Inspection Service (USDA-FSIS) are collecting different types of data to investigate two multistate outbreaks of Salmonella infections—one involving Salmonella Typhimurium infections and one with Salmonella Infantis infections.

> Epidemiologic data show that the likely sources of both outbreaks are Italian-style meats. Investigators are working to determine specific brands and products that are causing illnesses and whether the outbreaks are linked to the same Italian-style meat brands and products.

> Epidemiologic Data
> As of August 24, 2021, a total of 36 people infected with either Salmonella outbreak strain have been reported. This includes 23 people who are part of the Salmonella Typhimurium outbreak and 13 people who are part of the Salmonella Infantis outbreak.

> The true number of sick people in the outbreaks is likely much higher than the number reported, and the outbreaks may not be limited to the states with known illnesses. This is because many people recover without medical care and are not tested for Salmonella. In addition, recent illnesses may not yet be reported as it usually takes 3 to 4 weeks to determine if a sick person is part of an outbreak.

> OUTBREAK OF SALMONELLA TYPHIMURIUM INFECTIONS
> Twenty-three sick people have been reported from 14 states (see map). Illnesses started on dates ranging from May 30, 2021, to July 27, 2021 (see timeline).

> Sick people range in age from 4 to 91 years, with a median age of 44, and 67% are

male. Of 21 people with information available, 9 have been hospitalized. No deaths have been reported.

State and local public health officials interviewed people about the foods they ate in the week before they got sick. Officials also obtained sick people's shopper records with their consent. Of the 16 people with information, 14 (88%) ate Italian-style meats, including salami, prosciutto, coppa, and soppressata, that can often be found in antipasto or charcuterie assortments; several brands were reported. This percentage was significantly higher than the 40% of respondents who reported eating pepperoni or other Italian-style meats in the FoodNet Population Survey—a survey that helps estimate how often people eat various foods linked to diarrheal illness. This comparison suggests that people in this outbreak got sick from eating Italian-style meats.

OUTBREAK OF SALMONELLA INFANTIS INFECTIONS
Thirteen sick people have been reported from seven states (see map). Illnesses started on dates ranging from May 9, 2021, to June 24, 2021 (see timeline).

Sick people range in age from 1 to 74 years, with a median age of 41 years, and 31% are male. Of 10 people with information available, 3 have been hospitalized. No deaths have been reported.

State and local public health officials interviewed people about the foods they ate in the week before they got sick and collected their shopper records with their consent. Of the 8 people with information, all (100%) ate Italian-style meats, including salami and prosciutto, that can often be found in antipasto or charcuterie assortments; several brands were reported. This percentage was significantly higher than the 40% of respondents who reported eating pepperoni or other Italian-style meats in the FoodNet Population Survey—a survey that helps estimate how often people eat various foods linked to diarrheal illness. This comparison suggests that people in this outbreak got sick from eating Italian-style meats.

Laboratory Data
Public health investigators are using the PulseNet system to identify illnesses that may be part of this outbreak. CDC PulseNet manages a national database of DNA fingerprints of bacteria that cause foodborne illnesses. DNA fingerprinting is performed on bacteria using a method called whole genome sequencing (WGS).

For each outbreak, WGS showed that bacteria from sick people's samples are closely related genetically. This suggests that people in each outbreak got sick from eating the same food.

OUTBREAK OF SALMONELLA TYPHIMURIUM INFECTIONS
WGS of bacteria from 20 sick people's samples predicted resistance to ampicillin for 19 (95%) samples and to chloramphenicol, streptomycin, sulfamethoxazole, and tetracycline for all samples. Standard antibiotic susceptibility testing by CDC's

National Antimicrobial Resistance Monitoring System (NARMS) laboratory is currently underway. Most people with Salmonella illness recover without antibiotics. However, if antibiotics are needed, illnesses in this outbreak may be difficult to treat with ampicillin and may require a different antibiotic choice.

OUTBREAK OF SALMONELLA INFANTIS INFECTIONS
WGS of bacteria from 12 people's samples did not predict any antibiotic resistance. Standard antibiotic susceptibility testing by CDC's National Antimicrobial Resistance Monitoring System (NARMS) laboratory is currently underway.

Public Health Actions
Investigators are working to identify which Italian-style meat brands and products are making people sick.

Until then, CDC is advising people at higher risk for severe Salmonella illness to heat Italian-style meats to an internal temperature of 165°F or until steaming hot before eating.

*See* https://www.cdc.gov/salmonella/italian-style-meat-08-21/details.html

20.     On August 27, 2021, Costco sent an email to the Simas' membership account with the subject: "Food Safety Market Withdrawl [sic] Notice - Fratelli Beretta Uncured Antipasto 2/12oz." The email read as follows:



August 27, 2021
**Imprtant [sic] Food Safety Market Withdrawl [sic] Notice**
Fratelli Beretta Uncured Antipasto 2/12oz
Item 1191091
Dear Costco Member,

Costco records indicate you, or one of your add-on members, have purchased Item # 1191091 Fratelli Beretta Uncured Antipasto 2/12oz between February 18th 2021 and August 18th 2021.



At this point in time, Fratelli Beretta USA has issued a voluntary withdrawal of this item in an abundance of caution for consumer's safety, due to possible salmonella exposure.

All product with a Best By date of 2/11/2022 or earlier are included in this market withdrawal. The Best By date can be found on the front of the package, as shown below:



If you have any of this product remaining, do not consume the product. Please return it to your local Costco for a full refund.

Contact Fratelli Beretta USA with any questions at 866-918-8738 Monday to Friday from 9:00 AM to 5:00 PM ET or visit our website at www.fratelliberettausa.com for more information.

We apologize for any inconvenience this voluntary withdrawal may cause.

Sincerely,

Simone Bocchini
President,
Fratelli Beretta USA, Inc.

21.     The product described and depicted in Costco's August 27, 2021 email was the

exact product – the Antipasto Tray – that Mrs. Simas purchased at the Dedham Costco on June 30,

2021 and that Mr. Simas consumed in July 2021 immediately before his hospitalization on July 25, 2021.

22.     The product described and depicted in Costco's August 27, 2021 email was the exact product – the Antipasto Tray – was produced, packaged, stored and distributed from Fratelli's production facility located in Mount Olive, New Jersey.

23.     Also on August 27, 2021, FSIS issued an Announcement providing as follows:

WASHINGTON, Aug. 27, 2021 – Fratelli Beretta USA, Inc., a Mount Olive, N.J. establishment, is recalling approximately 862,000 pounds of uncured antipasto products that may be contaminated with Salmonella Infantis and/or Salmonella Typhimurium, the U.S. Department of Agriculture's Food Safety and Inspection Service (FSIS) announced today.

The ready-to-eat (RTE) uncured antipasto meat trays were produced on February 28, 2021 through August 15, 2021. The following products are subject to recall [view labels]:

24-oz. trays containing two 12-oz packages of "Fratelli Beretta UNCURED ANTIPASTO PROSCIUTTO, SOPPRESSATA, MILANO SALAMI & COPPA" with best by dates of AUG 27 21 through FEB 11 22 and UPC code 073541305316. The products subject to recall bear establishment number "EST. 7543B" printed on the packaging next to the best by date. These items were shipped to retail locations nationwide.

FSIS has been working with the Centers for Disease Control and Prevention (CDC) and public health partners to investigate a multistate outbreak of 36 Salmonella Typhimurium and Infantis illnesses in 17 states, with onset dates ranging from May 9 through July 27, 2021. Some ill people reported eating Fratelli Beretta brand uncured antipasto before they got sick and the traceback investigation confirmed that some of the ill people purchased uncured Antipasto Trays produced by Fratelli Beretta USA, Inc. FSIS continues to work with the CDC and state and local public health partners on this investigation to determine if additional products are linked to illness. FSIS will provide updated information if it becomes available.

Consumption of food contaminated with Salmonella can cause salmonellosis, one of the most common bacterial foodborne illnesses. The most common symptoms of salmonellosis are diarrhea, abdominal cramps, and fever within 6 hours to 6 days after eating the contaminated product. The illness usually lasts 4 to 7 days. Most people recover without treatment. In some persons, however, the diarrhea may be so severe that the patient needs to be hospitalized. Older adults, infants, and persons with weakened immune systems are more likely to develop a severe illness.

Individuals concerned about an illness should contact their health care provider.

FSIS is concerned that some product is in consumers' refrigerators. Consumers who have purchased these products are urged not to consume them. These products should be thrown away or returned to the place of purchase.

FSIS routinely conducts recall effectiveness checks to verify recalling firms notify their customers of the recall and that steps are taken to make certain that the product is no longer available to consumers. When available, the retail distribution list(s) will be posted on the FSIS website at www.fsis.usda.gov/recalls.

Consumers with questions regarding the recall can contact Fratelli Beretta USA Inc.'s recall hotline at 1-866-918-8738. Media may contact Marco Lastrico of Barabino & Partners USA, at m.lastrico@barabinousa.com or 917-634-1685.

24.    On August 31, 2021, FSIS issued a recall update, announcing as follows:

Public Health Actions

On August 27, 2021, Fratelli Beretta issued a recall of one of their uncured antipasto products; however, CDC continues to advise people to not eat any Fratelli Beretta brand Uncured Antipasto Trays with "best by" dates on or before February 11, 2022.

25.    On October 26, 2021, FSIS confirmed that epidemiologic data showed that Fratelli Beretta brand prepackaged Uncured Antipasto Trays made people sick. Specifically, a total of 40 people infected with the outbreak strains of *Salmonella* Infantis (14) or *Salmonella* Typhimurium (26) were reported from 17 states (see map). The true number of sick people in the outbreak was likely much higher than the number reported, and the outbreak may not be limited to the states with known illnesses.

26.    Illnesses started on dates ranging from May 9, 2021, to August 16, 2021 (see timeline). Sick people ranged in age from 1 to 91 years, with a median age of 41, and 51% were male. Of 35 people with information available, 12 were hospitalized. No deaths were reported.

27.    According to FSIS, as of October 26, 2021, the outbreak was over.

28.    As a result of the incident, Plaintiff has suffered severe, ongoing and continuing

injuries to his gastrointestinal tract, among other areas of the body. His symptoms are still unresolved and have led to the aggravation and exacerbation of other medical conditions, causing Plaintiff's health to be seriously compromised. Plaintiff has and continued to require extensive medical treatment as a result of the Salmonella exposure, and has and continues to suffer great physical pain and emotional distress.

### Actions by Fratelli and Costco Prior to Outbreak

29.     Fratelli manufactured the contaminated food items that are the subject of this action, with knowledge that the products would be distributed into the interstate marketplace, including to consumers in the State of Massachusetts, including patrons of the Dedham Costco.

30.     Fratelli was aware that the products that it manufactured for sale in Costco's retail locations would be disturbed in the interstate marketplace, including to consumers in the State of Massachusetts.

31.     Fratelli has committed a tortious act causing injury to a person within the State Massachusetts while, at all relevant times:

      a.  regularly doing or soliciting business, and/or engaging in a persistent course of conduct, and/or

      b.  deriving substantial revenue from good used or consumed, or services rendered in the State of Massachusetts (namely, for example, its business dealings with Costco); and (ii) expecting or reasonably expecting the act to have consequences in the State of Massachusetts and deriving substantial revenue from interstate or international commerce.

32.     Fratelli manufactured and distributed a defective, unsafe and contaminated food product named "Fratelli Beretta Uncured Antipasto 2/12oz." which Defendant Costco did then sell

to the Plaintiff.

33.    Costco is one of the largest and most sophisticated retailers in the United States. According to its published statements, its mission is "to continually provide our members with quality goods and services at the lowest possible prices." It also pledges to "comply with safety and security standards for all products sold" and "provide high quality, safe and wholesome food products by requiring that both suppliers and employees be in compliance with the highest food safety standards in the industry."

34.    Costco is well aware of the dangers associated with foodborne pathogens, including *Salmonella,* in the food it sells. For example, its meat products have been implicated in prior foodborne illness outbreaks including those involving *E.coli* 0157:H7. As a result, Costco requires vendors of food products known to be at higher risk for containing foodborne pathogens to take greater precautions. Upon information and belief, in the case of its ground beef suppliers, Costco requires additional testing for *E.coli* 0157:H7.

35.    Fratelli and Costco knew or should have known that producing uncured meat on a large scale further increases the risk of bacterial contamination; and that production facilities used for uncured meat should have heightened safety standards to account for these risks.

36.    Upon information and belief, prior to the foodborne illness outbreak described herein, Costco implemented product safety practices, policies, and procedures for selecting, screening, and monitoring the manufacturers and suppliers of uncured Italian-style meats sold at Costco stores to assure that the food produced by those manufacturers and suppliers was free of adulterants and pathogens and was otherwise safe.

37.    Upon information and belief, prior to the foodborne illness outbreak described herein, Defendants Costco and Fratelli entered into a business relationship in which Fratelli agreed

to produce and Costco agreed to market and sell a significant quantity of Fratelli uncured meats.

38.     Upon information and belief, Costco required Fratelli to execute a detailed vendor agreement requiring, among other things, that Fratelli comply with federal and state food safety laws and regulations.

39.     Upon information and belief, the vendor agreement allowed Costco to inspect the Fratelli food production facility and test Fratelli's uncured meat products, including the products sold to the Simas family and consumed by Mr. Simas.

40.     Despite its own practices, policies, procedures and agreements designed to prevent the production, processing, packaging, distribution and sale of contaminated food, Fratelli and Costco failed to do the following prior to selling Fratelli Antipasto Trays:

    a.   Properly inspect Fratelli's uncured meat production facilities;

    b.   Adequately monitor, oversee and inspect Fratelli's production techniques and safety practices;

    c.   Detect the unsafe and unsanitary conditions at the Fratelli production facility;

    d.   Test or require adequate testing of Fratelli Antipasto Trays;

    e.   Review the label on the Fratelli Antipasto Trays for regulatory compliance, adequate warnings, and clarity; and

    f.   Otherwise identify and take appropriate action to prevent unhealthy practices present at Fratelli's New Jersey production facility.

### COUNT I
### PRODUCTS LIABILITY - FAILURE TO WARN
(NJ. Products Liability Act - N.J.S.A. 2A:58C-2 et seq.)

41.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if set forth fully herein.

42.     Defendants researched, developed, designed, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the contaminated Antipasto Tray that is the subject of the action, and in the course of same, directly advertised or marketed the product to consumers, and therefore had a duty to warn of the risks associated with the use of it.

43.     The contaminated Antipasto Tray was under the exclusive control of Defendants and was unaccompanied by appropriate warnings regarding the risk of *Salmonella* and other severe and permanent injuries associated with its use. The warnings given did not accurately reflect the risk or severity of such injuries to consumers.

44.     Defendants downplayed the serious and dangerous risks of the contaminated Antipasto Trays to encourage sales of the product; consequently, defendants placed their profits above customers' safety.

45.     The contaminated Antipasto Tray was defective and unreasonably dangerous when it left the possession of Defendants in that it contained warnings insufficient to alert Plaintiff to the dangerous risks associated with it, including, but not limited to *Salmonella*. Even though defendants knew or should have known of the risks and reactions associated with the *Salmonella*, they still failed to provide warnings that accurately reflected the severity of the risks associated with the product.

46.     Plaintiff consumed the Antipasto Tray as intended or in a reasonably foreseeable manner.

47.     Plaintiff could not have discovered any defect in the contaminated Antipasto Tray through the exercise of reasonable care.

48.     Plaintiff did not have the same knowledge as Defendants and no adequate warning

was communicated to him.

49.     Defendants had a continuing duty to warn consumers, including Plaintiff, of the dangers associated with the contaminated Antipasto Tray, and by negligently and/or wantonly failing to adequately warn of the dangers associated with its use, Defendants breached their duty.

50.     Although Defendants knew, or were reckless in not knowing, of the defective nature of the contaminated Antipasto Tray, they continued to produce, manufacture, market, and sell it without providing adequate warnings and instructions so as to maximize sales and profits at the expense of the public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by it.

51.     Defendants Fratelli and Costco exercised significant control over the design, processing, manufacture, packaging, and/or labeling of the contaminated Antipasto Tray product in that it bore Fratelli's private label.

52.     Defendants Fratelli and Costco also knew or should have known of the defect in the product-that this batch of Antipasto Trays was contaminated with the bacteria *Salmonella*.

53.     Plaintiff's illness and associated injuries occurred as a direct and proximate result of the defective and unreasonably dangerous condition of the contaminated Antipasto Tray product that Defendants manufactured and sold.

54.     As a direct and proximate result of the defective and unreasonably dangerous condition of the contaminated Antipasto Tray product and its packaging and labeling, Plaintiff sustained severe injuries as set forth above.

55.     In addition, Defendants' aforementioned conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the rights and safety of consumers, including Plaintiff.

56.     Plaintiff is entitled to punitive damages because Defendants' conduct was wanton, grossly reckless, and/ or in conscious disregard of Plaintiffs' rights and the rights of other consumers.

WHEREFORE, Plaintiff demands judgment on this Count against the Defendants individually, jointly, severally, or in the alternative; for general damages in an amount according to proof at trial; economic damages according to proof at trial; attorneys' fees and costs of investigation as allowed by law; punitive damages as allowed by law; prejudgment interest as allowed by law; costs of suit incurred herein; and such other and further relief as the court may deem just and proper.

## COUNT II
## PRODUCTS LIABILITY - DEFECTIVE DESIGN
(N.J. Products Liability Act - N.J.S.A. 2A:58C-2 et seq.)

57.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if set forth fully herein.

58.     At all times material herein, defendant Fratelli was a manufacturer and seller of the contaminated Antipasto Tray that is the subject of the action and was in the business of manufacturing and selling like products.

59.     The contaminated Antipasto Tray product that defendant manufactured and sold was, at the time that it left defendant's control, defective and unreasonably dangerous for its ordinary and expected use because it contained *Salmonella* Infantis*,* a harmful and potentially lethal pathogen.

60.     The contaminated Antipasto Tray product that defendant manufactured and sold was delivered to Julius Simas Jr.  without change in its defective condition. Mr. Simas thereafter

did not misuse the product and used the product in a reasonably foreseeable manner by consuming the contents of the contaminated Antipasto Tray.

61.     Defendant Costco exercised significant control over the design, manufacture, packaging, and/or labeling of the contaminated Antipasto Tray product in that it bore Costco's private label.

62.     Defendant Costco also knew or should have known of the defect in the product-that this brand of Antipasto Tray was contaminated with the bacteria *Salmonella* Infantis.

63.     Plaintiff's illness and associated injuries occurred as a direct and proximate result of the defective and unreasonably dangerous condition of the contaminated Antipasto Tray product that defendants manufactured and sold.

64.     As a direct and proximate result of the defective and unreasonably dangerous condition of the contaminated Antipasto Trays, Plaintiff sustained severe injuries.

65.     In addition, Defendants' aforementioned conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the rights and safety of consumers, including Plaintiff.

66.     Plaintiff is entitled to punitive damages because Defendants' conduct was wanton, grossly reckless, and/or in conscious disregard of the rights of Plaintiff and other consumers.

WHEREFORE, Plaintiff demands judgment on this Count against the defendants individually, jointly, severally, or in the alternative; for general damages in an amount according to proof at trial; economic damages according to proof at trial; attorneys' fees and costs of investigation as allowed by law; punitive damages as allowed by law; prejudgment interest as allowed by law; costs of suit incurred herein; and such other and further relief as the court may deem just and proper.

16

## COUNT III
## NEGLIGENCE

67.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effect as if set forth fully herein.

68.     Defendants owed Plaintiff, and other consumers, a duty to exercise reasonable care in the designing, manufacturing, marketing, advertising, distributing, handling, and selling their Antipasto Tray products. The observance of which duty would have prevented or eliminated the risk that Defendants' Antipasto Tray products would become contaminated with *Salmonella* lnfantis*, and that Plaintiff and others would become infected with *Salmonella* Infantis due to the presence of Defendants' Antipasto Tray products. Defendants breached this duty and were therefore negligent.

69.     Defendants additionally failed to include an adequate warning of the significant and dangerous risks of *Salmonella* Infantis and without proper instruction to avoid the harm which could foreseeably occur as a result of using the product.

70.     Defendants owed to Plaintiff a duty to comply with all applicable statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, handling, and sale of their Antipasto Tray products. Defendants breached this duty and were therefore negligent.

71.     Plaintiff was among the class of persons intended to be protected by the statutes, laws, regulations, and safety codes referenced above and pertaining to the manufacture, distribution, handling and sale of Antipasto Tray products.

72.     Defendants owed a duty to properly supervise, train, and monitor their employees, and to ensure its employees' compliance with all applicable statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of Antipasto Tray products. Defendants breached this duty and were therefore negligent.

73.     Defendants owed a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, free of defects, and that otherwise complied with applicable federal, state, and local laws, ordinances, and regulations, and that were clean, free from adulteration, and safe for human consumption. Defendants breached this duty and were therefore negligent.

74.     As a direct and proximate result of the several breaches of duty set forth above, the Plaintiff's illness and associated injuries occurred.

75.     In addition, Defendants' aforementioned conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the rights and safety of consumers, including Plaintiff.

76.     Plaintiff is entitled to punitive damages because Defendants' conduct was wanton, grossly reckless, and/or in conscious disregard of Plaintiff's rights and the rights of other consumers.

WHEREFORE, Plaintiff demands judgment on this Count against the Defendants individually, jointly, severally, or in the alternative; for general damages in an amount according to proof at trial; economic damages according to proof at trial; attorneys' fees and costs of investigation as allowed by law; punitive damages as allowed by law; prejudgment interest as allowed by law; costs of suit incurred herein; and such other and further relief as the court may deem just and proper.

## COUNT IV
## BREACH OF EXPRESS WARRANTY

77.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effects as if set forth fully herein.

78.    Defendants expressly represented to Plaintiff that the contaminated Antipasto Tray was safe and fit for its intended purposes, and that it was of merchantable quality.

79.    Defendants expressly warranted, through its sale of Antipasto Tray to the public and by the statements and conduct of its employees and agents, that Defendants' Antipasto Tray was fit to feed to humans and not otherwise contaminated or injurious to health.

80.    The contaminated Antipasto Tray does not conform to Defendants' express representations because it is not safe, and causes severe and permanent injuries, including but not limited to significant and dangerous risks of *Salmonella Infantis.*

81.    At all relevant times the contaminated Antipasto Tray did not perform as safely as an ordinary consumer would expect, when used as intended or in a reasonably foreseeable manner.

82.    As a direct and proximate result of Defendants' actions, omissions, and misrepresentations, the Plaintiff's illness and associated injuries occurred.

83.    In addition, Defendants' aforementioned conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the rights and safety of consumer, including Plaintiff.

84.    Plaintiff is entitled to punitive damages because Defendants' conduct was wanton, grossly reckless, and/or in conscious disregard of the right of Plaintiff and other consumers.

WHEREFORE, Plaintiff demands judgment on this Count against the defendants individually, jointly, severally, or in the alternative; for general damages in an amount according to proof at trial; economic damages according to proof at trial; attorneys' fees and costs of investigation as allowed by law; punitive damages as allowed by law; prejudgment interest as allowed by law; costs of suit incurred herein; and such other and further relief as the court may deem just and proper.

## COUNT V
## BREACH OF IMPLIED WARRANTY

85.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effects as if set forth fully herein.

86.     Defendants manufactured, distributed, advertised, promoted, and sold the contaminated Antipasto Tray.

87.     At all relevant times, defendants knew of the use for which the contaminated Antipasto Tray was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

88.     Defendants were aware that consumers, including Plaintiff, would use the contaminated Antipasto Tray for human consumption.

89.     Plaintiff reasonably relied upon the judgment and sensibility of defendants to sell the contaminated Antipasto Tray only if it was indeed of merchantable quality and safe and fit for its intended use.

90.     Defendants breached their implied warranty to consumers, including Plaintiff, because the contaminated Antipasto Tray was not of merchantable quality or safe and fit for its intended use.

91.      Consumers, including Plaintiff, reasonably relied upon Defendants' implied warranty for the contaminated Antipasto Tray.

92.     The contaminated Antipasto Tray reached consumers without substantial change in the condition in which it was manufactured and sold by defendants.

93.     The contaminated Antipasto Tray products that Defendants manufactured and sold to Julius Simas, Jr. / the Simas Family would not pass without exception in the trade and were therefore in breach of the implied warranty of merchantability and fitness for a particular purpose.

94.     As a direct and proximate result of the breaches of implied warranties set forth above, the Plaintiff's illness and associated injuries occurred.

95.     In addition, Defendants' aforementioned conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the rights and safety of consumer, including Plaintiff.

96.     Plaintiff is entitled to punitive damages because Defendants' conduct was wanton, grossly reckless, and/ or in conscious disregard of Plaintiff's rights and the rights of other consumers.

WHEREFORE, Plaintiff demands judgment on this Count against the defendants individually, jointly, severally, or in the alternative; for general damages in an amount according to proof at trial; economic damages according to proof at trial; attorneys' fees and costs of investigation as allowed by law; punitive damages as allowed by law; prejudgment interest as allowed by law; costs of suit incurred herein; and such other and further relief as the court may deem just and proper.

## COUNT VI
## FRAUDULENT MISREPRESENTATION

97.     Plaintiff repeats and realleges each and every allegation set forth above with the same force and effects as if set forth fully herein.

98.     Defendants made fraudulent misrepresentations with respect to the contaminated d Antipasto Tray in the following manner:

      a.  Defendants represented through their labeling, advertising, and marketing materials that the contaminated Antipasto Tray was safe for use for human consumption; and

      b.  Defendants failed to warn of any contamination and/or *Salmonella* Jnfantis associated with the Antipasto Tray.

99.     Defendants knew that their representations were false, yet they willfully, wantonly, and recklessly disregarded their obligation to provide truthful representations regarding the safety and risks of the contaminated Antipasto Tray to consumers, including Plaintiff.

100.    The representations were made by defendants with the intent that consumers, including Plaintiff, rely upon them.

101.    Defendants' representations were made with the intent of defrauding and deceiving Plaintiff and other consumers, to induce and encourage the sale of the Antipasto Tray.

102.    Plaintiff and other consumers relied upon the representations.

103.    Defendants' fraudulent representations evinced their callous, reckless, and willful indifference to the health, safety, and welfare of consumers, including Plaintiff.

104.    As a direct and proximate result of the fraudulent misrepresentations set forth above, the Plaintiff's illness and associated injuries occurred.

105.    In addition, Defendants' aforementioned conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the rights and safety of consumer, including Plaintiff.

106.    Plaintiff is entitled to punitive damages because Defendants' conduct was wanton, grossly reckless, and/or in conscious disregard of the right of Plaintiff and other consumers.

WHEREFORE, Plaintiff demands judgment on this Count against the Defendants individually, jointly, severally, or in the alternative; for general damages in an amount according to proof at trial; economic damages according to proof at trial; attorneys' fees and costs of investigation as allowed by law; punitive damages as allowed by law; prejudgment interest as allowed by law; costs of suit incurred herein; and such other and further relief as the court may deem just and proper.

## COUNT VII
## CONSUMER FRAUD ACT
(N.J.S.A. 56:8-2 *et seq.*)

107.    Plaintiff repeats and realleges each and every allegation set forth above with the same force and effects as if set forth fully herein.

108.    Antipasto Tray such as the contaminated Antipasto Tray is "merchandise," as that term is defined by the Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*

109.    Defendants are persons within the meaning of the Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*

110.    Plaintiffs purchased the contaminated Antipasto Tray.

111.    Plaintiffs used the contaminated Antipasto Tray for its intended or reasonably foreseeable purpose, human consumption, in the manner directed by the product.

112.    Defendants violated the Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.,* in the following manner:

   a.  Defendants engaged in unconscionable commercial practices, through deception, fraud and making false promises and misrepresentations, including, but not limited to marketing and promoting the contaminated Antipasto Tray as safe and as otherwise providing benefits as detailed in this Complaint without full and adequate disclosure of the underlying facts which rendered such statements false and misleading.

   b.  Defendants used and employed deception, fraud, false pretenses, false promise and misrepresentation in the following manner:

      i.  Failing to disclose knowledge of the hazards and risks posed by the use of the contaminated Antipasto Tray; and

      ii.  Downplaying and understanding the health hazards and risks associated with the use of the contaminated Antipasto Tray.

   c.  In connection with the sale, advertisement and marketing of the contaminated Antipasto Tray, defendants engaged in knowing concealment, suppression and omission of material facts regarding the risks and hazards created by the use of the contaminated Antipasto Tray

113.    The aforesaid promotion and release of the contaminated Antipasto Tray into the stream of commerce constitutes an unconscionable commercial practice, deception, false pretense, misrepresentation and/or the knowing concealment, suppression or omission in connection with the sale or advertisement of such merchandise by defendants in violation of the Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*

114.    Defendants' actions in connection with the manufacture, distribution, and marketing of the contaminated Antipasto Tray as set forth herein evidence a lack of good faith, honesty in fact, and observance of fair dealing so as to constitute unconscionable commercial practices in violation of the Consumer Fraud Act, N.J.S.A., 56:8-2, *et seq.*

115.    As a result of Defendants' violation of the Consumer Fraud Act by use or employment of the methods, acts or practices described herein, Plaintiff has suffered ascertainable losses, in that Plaintiff paid money to purchase the contaminated Antipasto Tray.

116.    As a direct and proximate result of Defendants' unconscionable commercial practice, including knowing concealment and fraudulent misrepresentations, Plaintiff's illness and associated injuries occurred.

117.    The foregoing knowing concealment and fraudulent misrepresentations by defendants constituted a violation of the New Jersey Consumer Fraud Act under R. 56:8- 1 *et seq.,* entitling Plaintiff to recover attorneys' fees and actual and statutory damages.

WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages, in amounts to be proven at trial, and that Plaintiff be awarded reasonable attorneys' fees, costs, and such other and further relief as may be deemed just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants.

**JURY DEMAND**

Pursuant to F.R.C.P. 38(b), Plaintiff hereby demands a trial by jury on all of the triable issues stated herein.

Dated: June 21, 2023

Respectfully submitted,

**HACH & ROSE, LLP**

By: _____

John A. Blyth
112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: (212) 779-0057
Facsimile: (212) 779-0028

*Counsel for Plaintiff*